With that, we'll move to the second and final case on the argument calendar, Eichenberger v. Kijakazi. And I believe both counsel are appearing via Zoom. And we'll wait a second as counsel from the previous case gather their materials. All right, I want to make sure counsel can hear us. So, Mr. Janich, you are there? Yes, I am. And you can hear us? Yes, I can. All right, Mr. Talbert, you're there? Yes, Your Honor. And you can hear us? Yes, I can, Your Honor. Great, all right. So, counsel, whenever you're ready, you can begin. And counsel have 15 minutes per side. Thank you. May it please the court. My name is Eitan Janich, and I am representing Sarah Eichenberger in this appeal. Eichenberger first applied for Social Security Disability Benefits in November, 2014. The final determination on that application can be reopened for any reason. Eichenberger applied again in January, 2016. She's alleged disability since November, 2014, and she has not worked since 2014 due to the combined functional effects of many impairments, including many mental impairments, as well as fibromyalgia. Two examining psychologists, Dr. Arthur Holt and Dr. Wheeler and four treating mental health therapists, Ms. Godsey, Ms. Diamond, Ms. Nichols, and Ms. Hook, have all opined that Eichenberger has mental functional limitations that are disabling, and their opinions are fully consistent with the treatment records from many treatment providers. But the ALJ improperly failed to credit these essentially uncontradicted medical opinions, while instead relying on the opinions of non-examining state agency physicians and psychologists who never met, examined, or treated Eichenberger, and who did not even review her entire record. Most of those non-examiners that the ALJ relied on didn't review any evidence beyond July, 2016. Two of them reviewed May of 2019, but none of them reviewed all the evidence. But in discounting, for example, Dr. Wheeler, but the others as well, it seems to me that the ALJ extensively cited from the longitudinal record, extensively cited from the examinations of the discounted treaters, and talked about, for example, some of the activities of daily living of your client that the ALJ found were in some ways inconsistent with the opinions. So to get to the heart of it with my problem here is given the extremely deferential standard of review, why was the ALJ's analysis such that we have to reverse? I mean, although we reviewed the district court de novo, seems like the district court identified what I'm talking about in a way that I find pretty on point. So where is my question? Where am I potentially going wrong, and where did the district court, even though we're reviewing it de novo, go wrong in terms of what the district court cited? I'm sorry, in terms of what the ALJ cited. Thank you. There are seven years of treatment notes here. Actually, it's maybe more than that, but there's such a long longitudinal record of treatment. And for many of those years, there's very few normal, I mean, the findings, the abnormal findings far outweigh the normal findings. Then there are periods throughout this, and especially more recently, there were periods where there was some improvement, she became more active, and then there was worsening again. And under Garrison, the fact that there are some periods where a person gets a little bit better and is more functional is not a valid or convincing reason to reject their testimony about how they were doing in all of the lengthy time periods where they are very dysfunctional. The evidence includes periods of time, months at a time where she would not even leave her house, months, and there's other times where she was leaving her house because her therapist advised her, that was the treatment recommended for her, that she needed to fight against the agoraphobia by leaving. So she did. But even throughout that time, there's a big difference between being able to leave the house to go to your therapist, for example, or to go even to do some minor activities such as shopping, big difference between that and being able to go to a competitive workplace and be there for eight hours a day, five days a week. To be clear, is the issue with the ALJs holding that it's not sufficiently specific or that it's not, I guess, clear and convincing or is it that it's both, both not specific and not clear and convincing in your view? Well, I think the problem in the ALJs analysis is that while she was able to cite, let us say 40 normal findings or even 50 normal findings from the record, there are hundreds and hundreds of abnormal findings that she literally ignored. And the issue, when an ALJ is evaluating the evidence, they're required to base their opinion on a preponderance of the evidence. And I just can't see in reviewing this, and the reason I provided in my brief a chronological discussion of the treatment and the findings for the many years that Eichenberger is being treated is to give you that sense of the longitudinal evidence that the ALJ failed to address, failed to explain why none of that matters. All that matters is there were some normal findings. I don't see how a reasonable finder of fact could conclude that a preponderance of the evidence here showed that she was functional enough to be able to attend to any type of competitive employment. So, counsel, I'm gonna give your friend here a preview of a question I'm gonna be asking him, but I think I know your answer to this, but let me ask it anyway. At ER 32, the ALJ found the claimant is able to perform work that does not require contact with the public. She's able to have occasional superficial contact with coworkers and nothing involving team tasks. If those are your client's limitations, what is your view of how she could perform housekeeping, hotel, motel services, hand packer, inspector services, or assembler of small parts work with those specific limitations that the ALJ identified on ER 32? Well, what complicates things here, very much so, and this is, I have to address this in response to your question, is the issue of the functional effects of her fibromyalgia and seronegative rheumatoid arthritis, that she had time periods, for example, when she was last working, and her former employer submitted a statement stating how towards the end of her work, she was having to wear braces on both wrists and couldn't use a computer. So throughout the record, there's ongoing treatment for fibromyalgia. She's been treated by, I believe, four different rheumatologists. They've tried lots of different medications on her. Some had very harsh side effects. But I think that the ALJ's residual functional capacity does not account for the severe symptoms of fibromyalgia that she has been experiencing. There is no way this woman would have been able to perform the work of a housekeeper. Now, I'm only addressing the physical issue here first, and especially in any of the assembly things that require use of the hands, she would not be able to use her hands throughout a day to do those things. But once again, I'm on the physical issues. Turn back to the mental issues, and what the key issue is that all of the examining psychologists and the treating therapists all said is that she wouldn't be able to handle regular attendance at a normal workplace because she was not functional, didn't have the ability to do that. And so her attendance would be so deficient as it was when she was last working, her attendance would be so deficient that she wouldn't be able to sustain any of those jobs. If you have any other questions for me, I'd be happy to answer them. And otherwise, I would like to reserve my time for rebuttal. All right, thank you. We'll hear from your friend. Good morning, Your Honors. Daniel Talbert on behalf of Kilolo Kijikazi, the Acting Commissioner of Social Security. The administrative law judge reasonably relied on five different assessments from psychologists and four different assessments from physicians to conclude that claimant Sarah Eichenberger was not disabled under the Social Security Act. The ALJ considered Eichenberger's allegations of disabling physical and mental symptoms, but she reasonably found them inconsistent with the record. Not only those nine assessments that I mentioned before, but also physical examination findings, mental status examinations, Eichenberger's own denial of symptoms or reporting of only mild or maybe moderate symptoms, her various activities, her improvement with treatment. And on top of all of that, the ALJ also identified some evidence of possible concerns of malingering or drug-seeking behavior. She never used the word malingering, did she? The ALJ, Your Honor? I mean, she never found that the claimant was malingering, right? I think she said there were concerns about it. Yeah, but that's different than saying she was malingering, right? Right, the ALJ doesn't say, I find this claimant is a malingerer and therefore I reject everything she said. And my point is simply that that's one, kind of one piece of the puzzle. The ALJ is looking at all this evidence, all of these inconsistencies, and that's one of the things that's in there. I want to turn, and sort of maybe it's because I don't understand the technical requirements of the jobs the ALJ identified, but certainly from like maybe a common sense kind of perspective, how could somebody do, for example, a housekeeper, hotel, motel job if they are only able to have occasional superficial contact with coworkers and nothing involving team tasks and they can have no contact with the public at all? I mean, how can you do a housekeeper job, a hand packer job, or an assembler job if you have those limitations? Thank you, Your Honor. So the first response, and I'll give a more detailed response after, so the first response is because a vocational expert witness testified without objection, really at the hearing and also without objection in my friend Mr. Janic's briefing or argument here, that someone with those limitations could perform those jobs. And that person's the expert witness. ALJ is allowed to rely on that. There's a lot of Ninth Circuit case law to support that. The more detailed reason about, let's talk, I'll talk about the housekeeper in particular because I'll say in preparation for this, Your Honor, I thought the same thing. I was thinking, well, housekeeper, that seems like maybe there is an issue, so let's see what the testimony showed. And on page 1442 of the certified administrative record, the claimant's representative asked the vocational expert witness about that, about wait a minute, what about a housekeeper? And the expert witness said, well, here's how kind of how the job goes. They may knock on the door, and I'm quoting from 1442, and see if anybody's in the room. And if somebody's in the room, they have to go to the next room kind of thing. But there's no part or requirement of their job to interact with the public. And the expert, when pressed a little more, I guess said, well, you know, they might say hi or good morning to people walking down the halls, but their job doesn't require public interaction. So we have an explanation from the expert on the record. ALJ accepts this. The claimant hasn't challenged it or made any arguments about it. And frankly, even if there were concerns that, you know, even if the court had concerns about that, which I don't think have been properly raised here by the parties, by the appellant, I think there's about 40,000 other jobs in small parts assembly and hand packing or inspecting, which are, you know, factory jobs that are not going to be involving any kind of public facing work. So for that reason, the ALJ could properly rely on that evidence to conclude that Ms. Eichenberger was not disabled. Well, I mean, what I'm about to say is probably an entirely irrelevant comment, and I apologize for it. But as someone who actually had one of these jobs in the past as an assembler of small parts, it's just hard for me to imagine how you can do that with almost no contact with coworkers or team tasks. But again, my idiosyncratic employment experience is not in the record. Well, Your Honor, and Your Honor may well have done, you know, Ms. Eichenberger better service at the hearing representing him or her, I'm sorry, and possibly arguing those points, but that wasn't brought to the expert's attention. That wasn't challenged in any way. So it's, again, it's not in our record, and it was fair for the ALJ to rely on that expert's uncontradicted testimony. Now, I want to focus on, I'm happy to answer any questions, of course, that the panel has, but I'm going to focus a little bit on some of the comments that my friend made. He identified the, he characterized, I believe, some of the evidence about Ms. Eichenberger's mental functioning as essentially uncontradicted, saying what the examining sources and the therapist said. That's plainly wrong on this record. We have, again, five psychologists who are experts in social security disability programs and in mental health evaluations who reviewed Ms. Eichenberger's records, who looked at it in 2015, 2016, I think most recently 2019, and those doctors all concluded that Ms. Eichenberger was capable of performing a range of simple work with significant social limitations, but not disabling social limitations. And the ALJ reasonably relied on that evidence, on those assessments by those doctors. The ALJ gave specific reasons for rejecting the opinions that found greater limitations. Dr. Arthur Holtz, who examined claimants in early 2015, the ALJ pointed out that within a few months of that examination, Eichenberger's anxiety went from a self-report of severe anxiety to moderate and then mild anxiety. And the ALJ kind of traces that throughout the relevant period of how, with medication and therapy, the claimant's improving, about how the claimant's engaging in more and more activities. And when you couple that with the unanimous opinion of those five psychologists who reviewed the records and who had a more complete picture of Ms. Eichenberger's functioning than Dr. Arthur Holtz or Dr. Wheeler had, that easily satisfies the substantial evidence standard. I'll touch very, very briefly also on my friend's discussion of the fibromyalgia and the physical impairments. This is a point where there's actually uncontradicted opinion evidence in the ALJ's favor, because all four of the assessments of Ms. Eichenberger's physical functioning by medical professionals said that she was able to perform light work consistent with what the ALJ found. Dr. Staley reviewed the record and gave his assessment three different times, and Dr. Rubio did one time. And the ALJ discussed those assessments, disagreed in part with Dr. Staley about some hand limitations, but gave reasons for that, and the claimant isn't challenging that finding either. So we have essentially uncontradicted opinion evidence that the claimant's pain and other symptoms from fibromyalgia, physical symptoms, aren't gonna prevent her from working. So I just wanted to get that out there and make that point. The final point that I just wanna make then is just to highlight how extreme some of Ms. Eichenberger's allegations were here. I know that my friend has suggested that some of the activities were fairly minimal, the social activities. She struggled to go to therapy. She just went to the store and could do things like that. But that's not actually accurate. There's some more significant activities than that that she engaged in. She volunteered at an art gallery. She did a volunteer videography project. She attended public festivals and public art events. She went to church every week, went to visit friends out for coffee, went out to dinner, went to stay at people's houses. And the inconsistency here is particularly when you look at her hearing testimony. And I'm focused on especially pages 44, 1372, and 1440, when she testified basically that she's more or less isolating and confined to her home because of her anxiety. And she's saying that she can barely get out even to see her therapists, but yet the record shows she's doing quite a bit more than that. So the ALJ could reasonably rely on that to reject those extreme allegations. And I guess the other point is that in the 2020 and 2021 hearings, Ms. Eichenberger was saying kind of what my friend was saying that symptoms improved and then they got much worse and she had severe anxiety and pain. But the contemporaneous medical records that the ALJ talked about showed that her anxiety was controlled at that same time and showed that her pain was well controlled in addition. So the record looks, the ALJ looked at this record and reasonably found it inconsistent with Ms. Eichenberger's allegations. If there are no questions, the commissioner asks the court to affirm. All right, thank you, counsel. And counsel, you have a fair amount of time left for rebuttal. Thank you. I want to start by addressing Mr. Talbert's comment about the four assessments that said fibromyalgia was essentially not as significant as Eichenberger claims it is. And as she described it to her doctors and as it was found, as it was noted, the symptoms that were and the findings that were noted by the various rheumatologists and other doctors that examined her. All four of those assessments were by non-examining state agency physicians, all four of whom are being basically paid by Social Security to make a determination on whether or not she was disabled. Had they found the other way, had they found that this fibromyalgia was as severe as she claimed and that she really couldn't use her hands more than occasionally, it would have resulted in a finding of disability and we wouldn't be sitting here today talking about this case. So there's a principle under Social Security law, which perhaps is not still good law under regulations that were promulgated in March of 2017, but which do not apply here. There's a principle that the opinions of non-examining physicians by themselves do not constitute substantial evidence that could justify rejecting the opinions of treating or examining physicians because they are basically guessing. They're looking at a file, they're looking at treatment notes and they're doing their best to guess what can this person do or not do. They're not considering her testimony and that's actually one of the key differences between why are well over 50% of cases that are turned down by these non-examining physicians when it comes before a judge, the judge reverses that decision. It's because those non-examiners never consider the claimant's testimony. Well, with something like fibromyalgia, you cannot possibly determine what the individual's limitations are without asking them, without listening to them and without seeing whether or not it fits in with the other evidence that shows their activities matching that. But you can look at how treating physicians described what the claimant said. Absolutely and you could look at that and that's actually very important and there are no treating physicians here that questioned the legitimacy of fibromyalgia. They continue to try to find medication for treating it. I think I need to turn now to the activities. Yes, she has at times tried to do things but there's no evidence that any of those activities ever arose or were comparable to what would be required in competitive work. There's no evidence that any of those activities ever involved anything that was anywhere close to eight hours a day, five days a week of going to a workplace and doing something. And Eichenberger used to work. She doesn't want to be doing nothing. She's extremely unhappy. That's part of her problem is she has depression, she has anxiety, she has PTSD. She has a lot of different problems she's fighting and on top of it, she's got fibromyalgia that limits her ability to use her hands and it causes pain and it causes mental fog. There's no basis anywhere in the record for rejecting her testimony about how she's affected by the mental fog. This is fully consistent with the findings from all the mental health practitioners and once again, the fibromyalgia doctors, they just know that's one of the symptoms. They can't prove or disprove what it is that she's feeling there. The mental health therapist opinions, the ones who examined her and treated her and noted her mental confusion and her difficulty communicating, that fits in more with that but it's always often a complication with fibromyalgia that when the individual also has depression or also has anxiety, sometimes you can't tell are these mental fog symptoms just fibromyalgia? Are they just anxiety? Are they just depression? Are they all three? You can't break a person down that way. All they can look at is her actual functioning and she became an incredibly dysfunctional person and didn't choose to do that. This is the unfortunate direction her life has taken and unlike some cases, I've represented thousands of people over the years and unlike some cases, this isn't someone who went to a therapist now and then over time, got treatment now and then. She's been getting ongoing treatment for many years and that's why there are so many treatment notes detailing how poorly she was doing and admittedly, there's treatment notes where she was doing better. She didn't say I'm doing worse if she was doing better. So the longitudinal record here is about as strong a record as I ever see and I think one of the stronger and most consistent ones that you'll ever encounter. I think that the evidence here, and by the way, I didn't mention lay evidence but that fits in with this too. It does support her. So I would ask the court to find that Eichenberger has been disabled this entire time as a result of the combination of the functional effects of her mental impairments and her fibromyalgia and they have prevented her from doing any kind of full-time competitive work on a sustained basis.  Thank you. We thank counsel for their arguments and the case just argued is submitted with that, we are adjourned for the day. Thank you.
judges: BENNETT, VANDYKE, THOMAS